UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
LONDON

DIRECTOR ERIC A. TAYLOR, *Regional* )
*Director of the Ninth Region of the National* )
*Labor Relations Board, For and On Behalf* )      Case No. 6:26-cv-00106-GFVT
*of the* NATIONAL LABOR RELATIONS )
BOARD, )
 )
          Plaintiff, )                             **OPINION**
 )                                                 **&**
 )                                                 **ORDER**
v. )
 )
HEARTHSIDE FOOD SOLUTIONS, LLC, )
 )
          Defendant. )

*** *** *** ***

This matter is before the Court on Petitioner Eric A. Taylor's Petition for a Temporary

Injunction. [R. 1]. The National Labor Relations Act empowers the National Labor Relations

Board to investigate an employer's unfair labor practices. The Board may petition a district court

for a temporary injunction while these administrative proceedings occur. Petitioner Eric A.

Taylor, a Regional Director of the Board, seeks an injunction against Respondent Hearthside

Food Solutions LLC. The question before the Court is whether the traditional four-factor test for

equitable relief weighs in favor of enjoining Hearthside during the pendency of the Board's

ultimate decision. Because it does not, the Court **DENIES** Taylor's motion.

**I**

**A**

Before delving into the background of this case, it is appropriate to briefly outline the

procedure of a case brought under the National Labor Relations Act. The National Labor

Relations Act, 29 U.S.C. § 151 *et seq*., prohibits both employers and unions from engaging in

certain listed "unfair labor practices." Congress created the National Labor Relations Board to

investigate and adjudicate the provisions of the Act. 29 U.S.C. §§ 160, 161. An enforcement action begins when an individual files a charge with the Board alleging that an employer or union has engaged in an unfair labor practice in violation of the Act. *Glacier Northwest, Inc. v. Teamsters*, 598 U.S. 771, 775 (2023). A Regional Director of the Board reviews the charge and, upon a finding that the charge has merit, institutes formal action by issuing a complaint and a notice of hearing. 29 C.F.R. §§ 101.2., 101.8.

A formal hearing then takes place before an administrative law judge. *Id.* § 101.10. The Federal Rules of Evidence "are, so far as practicable, controlling," and the parties may examine and cross-examine witnesses, introduce evidence into the record, submit briefs, and engage in other activity typical in a judicial proceeding. *Id.* The ALJ then issues a decision and a recommended disposition. *Id.* § 101.11. Parties may file "exceptions" to the ALJ's decision, which then sends the case to the full Board sitting in Washington, DC, who may adopt, modify, or reject the ALJ's decision. *Id.* § 101.12. The Board may petition the appropriate Court of Appeals for the enforcement of its order if the respondent does not comply with the order. 29 U.S.C. § 160(e); 29 C.F.R. § 101.14.

The Board's administrative proceedings often take years to come to a final result, particularly where a case reaches the full Board.[1] *Starbucks Corporation v. McKinney*, 602 U.S. 339, 343 (2024). Mindful of this delay, the Act empowers the Board to seek preliminary injunctions during the pendency of the underlying administrative proceedings. 29 U.S.C. § 160(j). A so-called Section 10(j) petition gives the appropriate district court jurisdiction to "grant

---

[1] In March 2024, the Board's General Counsel released data about complaint processing times. In 2023, it took an average of 189 days from the filing of a complaint to reach a hearing before an ALJ, 141 days between that hearing and the ALJ's decision, and 117 days from an ALJ decision reaching the Board to the Board's ultimate decision. *See* Matt Bruenig, *NLRB Processing Times Have Dramatically Increased*, NLRB Edge (Mar. 6, 2024), [https://perma.cc/2L9A-YTLV].

to the Board such temporary relief or restraining order as it deems just and proper." *Id.* With an eye toward this procedural framework, the Court now turns to the factual background of this 10(j) petition.

## B

Hearthside Food Solutions, doing business as Maker's Pride, is an Illinois corporation that manufactures food products for the cookie and cracker industry. [R. 13 at 8]. Hearthside operates a production facility in London, Kentucky, employing between 650 to 700 employees. [*Id.*] The company operates plants in other states including Virginia, Ohio, and Indiana. [R. 3-6 at 2]. Although Hearthside entered into collective bargaining agreements at other facilities, it had not done so at the London facility. [*Id.* at 10].

Change was in the air at Hearthside even before the start of the unionization effort. In January 2023, Hearthside brought on Dave Horn as the new plant manager. [R. 13 at 9; R. 3-6 at 4 n.7]. When Horn started, he concluded that there was "zero accountability" across the plant. [R. 3-13 at 1208]. Existing rules were neither followed nor enforced. [*Id.* at 1209]. In December 2023, Horn held a town hall meeting where he announced that Hearthside would begin enforcing the company's "zero tolerance" policy toward cell phone use on the production floor. [*Id.* at 1210]. Around this time, the company also announced that it would cease matching employees' 401(k) contributions. [R. 3-6 at 4].

Other changes took place as the calendar turned to 2024. In January, the company migrated to a new attendance recordkeeping software.[2] [R. 13 at 10]. On February 1, 2024,

---

[2] Hearthside's attendance policy assigns points for attendance issues. The accumulation of 12.5 points results in termination. Employees receive "progressive discipline" based on the number of points they accrue. The software change was not without issue. The new software did not account for the attendance points entered into the prior system, and this discrepancy was not resolved until March. After its resolution, Hearthside claims it sent notices to all employees with at least half a point. Several employees had over 12.5 points. Instead of firing them, Hearthside sent them final written warnings and gave them the opportunity to get their points below the termination threshold. [R. 13 at 10] (citing [R. 3-13 at 1181–84]).

3

Hearthside hired Matt Moore as a third shift supervisor. [*Id.* at 9]. Prior to Moore's hiring, the third shift went without a salaried supervisor for a long time. [R. 3-14 at 19]. Moore testified that in his first two weeks he "set some ground rules" and informed his workers that the company "would [] start watching breaks" and would impose discipline for break violations. [*Id.* at 19–20]. But these management changes paled in comparison to the discussions occurring among the employees.

Sometime in early 2024, Hearthside employees Bobby Messer and Liticia Horton contacted the Bakery, Confectionary, Tobacco, and Grain Millers International Union headquarters seeking information about organizing. [R. 3-7 at 161–62]. Lisa Gregory, a union representative, contacted Messer and Horton and arranged to meet them at a hotel in London. [*Id.* at 162]. Horton and Messer met Gregory and Earl Farris, another union representative, at the London Holiday Inn Express on February 22. [*Id.*] The meeting concluded with Gregory and Farris giving the employees union authorization cards to pass out to their fellow employees who might be interested in joining a union.[3] [*Id.*]

The group planned to meet again on March 7. [*Id.* at 165]. Gregory created a digital flyer to distribute to employees, but in other respects she intended the effort to stay "quiet." [*Id.*] Horton and Messer started text groups with fellow employees who were interested in the meeting. They decided to "go public" with the union effort on March 12, by passing out informational flyers (i.e., "hand billing") outside the factory entrance as employees came in for work. [*Id.* at 168, 171]. Hearthside argues that March 12, 2024, is the first day that management

---

[3] At the hearing, Gregory noted that the purpose of union authorization cards is for employees to demonstrate support for holding a union vote. She further stated that a union needs at least 30 percent of a workforce to submit authorization cards in order for the union to file a petition. [R. 3-7 at 163–64]. Courts characterize union authorization cards as "expressing support for the Union" and as an "intent to vote to unionize." *Garten Trucking LC v. NLRB*, Nos. 24-1973, 24-2102, 2026 U.S. App. LEXIS 4796, at *5 (4th Cir. Feb. 18, 2026).

became aware of the unionization effort, even if "some supervisors may have heard rumors about potential organizing." [R. 13 at 12]. The Board argues that Hearthside had notice of the union effort as early as March 6, when an employee informed a supervisor of the March 6 hotel meeting. [R. 3-3 at 6]. This supervisor, in turn, provided this information—including the names of Messer and Horton—to operations manager Mike Ward. [*Id.*]

As the union effort picked up steam in early March ahead of the March 12 launch date, Hearthside hired a new Human Resources Manager, Samantha Daniels. Daniels began working for Hearthside on March 4, 2024. [R. 3-7 at 66]. Daniels testified that when she began, the human resources group "was in complete disarray" and "disconnected from the plant itself and its employees." [R. 3-15 at 58]. Almost immediately, Daniels faced a thorny disciplinary decision.

**1**

Michael Fox was a maintenance technician at Hearthside in March 2024. [R. 3-8 at 124]. Fox supported the union effort and passed out 20 authorization cards to his coworkers. [*Id.* at 125, 127]. The ALJ described Fox's union activity as "open and notorious at the plant." [R. 3-6 at 9]. Fox previously worked at a union job and spoke to his Hearthside coworkers about his positive experiences with unionization. [R. 3-8 at 128–29]. He testified that he pushed "hard for the union." [*Id.* at 132].

Lena Bowling, Hearthside's maintenance repair and operations buyer, heard a rumor that Fox had gotten into an altercation with a delivery driver from one of Hearthside's vendors, Fastenal. [R. 3-14 at 129]. Bowling was concerned about this and contacted the vendor. The vendor told Bowling that a Hearthside employee visited the Fastenal location and had been "very upset" and "puffed up" about an issue with his badge not giving him access to Fastenal's vending

machines, which employees use to check out tools to do their job. [R. 13 at 11]. Notably, the ALJ did not credit Bowling's testimony that the Fastenal manager told her that the Hearthside employee was Fox. [R. 3-6 at 8]. The ALJ concluded that "it is unclear when and how Bowling or [Hearthside] determined that Fox had interacted with the Fastenal manager." [*Id.*]

The vendor did clarify, however, that the altercation was not as dire as the rumors made it sound. The vendor told Bowling that Fox visited the Fastenal site to inquire about his badge. After discussing the issue, Fox left "in better humor." [R. 3-14 at 131]. Fox testified the "altercation" was anything but:

> We have a Fastenal machine. We have a badge that operates the machine. I've been there for almost a year. No one fixed my badge. The supervisor, the parts clerk, everybody, trying to get my badge fixed. Nobody would fix it. So I had to ask people to get the stuff I need out of that machine every day. And it got kind of annoying. So I—on my time—I was on my way to work, stopped in there, asked the guy at the desk if they can fix my badge. He goes, wait a minute. I'll get the manager. The manager comes up there. I go, can you fix my badge? He goes, yes. No problem. He goes, you need anything else?

[R. 3-8 at 141–42]. A day or two later, Fox spoke with his supervisor Michael Cook about the interaction and Cook told him, "don't go down there anymore. It's squashed. Don't worry about it." [R. 3-6 at 7]. This occurred sometime in February, as Horn and Misty Looper, a human resources generalist, knew about the Fastenal incident as early as February 23. [*Id.* at 8].

On March 8, Looper forwarded her email correspondence with the Fastenal vendor to Daniels. On the same day, operations manager Ward emailed Daniels with the subject line "Information on Michael Fox," stating that camera footage captured Fox leaving the property for 22 minutes on March 3, 2024, without clocking out. [R. 3-3 at 8]. Fox was home sick during the first week of March but returned to work on March 11. [R. 3-6 at 7]. He went to the human resources office to turn in his doctor's note and was met by Daniels and his supervisor, Michael

6

Cook. [*Id.*] Daniels gave Fox a termination notice, firing Fox on the basis of his interaction with the Fastenal vendor and because he had left without clocking out on March 3. Fox testified that he was "blindsided" by his firing and that no one had raised any issues with him before his March 11 firing. [R. 3-8 at 163].

At the hearing, Fox denied being rude with the Fastenal vendor. [R. 3-8 at 144–45]. He also testified that it was common practice for employees to go get pizzas for the maintenance team on Sundays without clocking out, and the ALJ noted that Hearthside provided no evidence to contradict this assertion. [R. 3-6 at 7]. Fox was never given the opportunity to make a statement in his defense during the termination meeting. [R. 3-8 at 153]. Instead, his supervisor escorted him out. [R. 3-18 at 191].

The ALJ determined that Fox's firing relied "on unverified and inadequately investigated rumor" and that his termination "was pretextual." [R. 3-6 at 9]. The ALJ noted that "he was terminated the day Respondent found that the Union would be at its gate the next day and 5 days after Respondent knew of the union meeting at the Holiday Inn Express." [*Id.* at 10]. Concluding that the "record is dripping with evidence of anti-union animus and animus toward Fox personally," the ALJ found that Hearthside engaged in unfair labor practices by firing Fox. [*Id.*]

**2**

The next day, March 12, was the Union's hand billing event outside of the plant entrance. Gregory, Farris, Horton, and a Union member from Bimbo Bakeries arrived at the facility at midday to pass out flyers. [R. 3-7 at 170]. The hand billing slowed down traffic on Laurel Road, the main road off of which Hearthside sits, and traffic began to build. Ward, Horn, and Daniels walked outside and described the scene as "chaotic." [R. 3-13 at 160]. Horn directed the security guard to call the police. [*Id.* at 113].

The police arrived, spoke to Horn, and then left. [R. 3-6 at 10]. The parties dispute the circumstances surrounding the decision to call the police. Hearthside argues that the traffic conditions required police intervention. [R. 13 at 13]. Taylor counters that management knew of the event in advance and that the police told Union officials they were called for a suspected trespassing violation, not because of traffic concerns. [R. 3-6 at 11]. The ALJ found that Hearthside violated Section 8(a)(1) of the Act by calling the police. [*Id.*]

**3**

After the March 12 launch date, Hearthside took steps to train its supervisors and managers on what they could and could not do in response to the union campaign. On March 13 and 14, Horn held a training with the plant's managers and supervisors. Horn explained that Hearthside employees could not threaten people, could not make promises in exchange for "no" votes, and otherwise could not instruct employees how to vote. [R. 3-13 at 117–18, 1262; R. 3-14 at 149–50].

The initial Union drive was successful throughout March. By the beginning of April, the Union had enough authorization cards to file for a petition. On April 5, the Union filed a petition for representation, seeking to represent a unit of full-time and regular part-time employees at Hearthside. [R. 3-3 at 12]. In support of the petition, the Union provided 346 authorization cards. [R. 3-27]. The representation election was set to take place roughly a month later on May 7 and 8, 2024. [R. 3-6 at 2].

By mid-April the Union drive began to slow with fewer authorization card collections and dwindling attendance at Union meetings. [R. 3-3 at 13]. Taylor attributes this to malice on the part of Hearthside, [*id.* at 13–14], while Hearthside counters that campaign enthusiasm may have ebbed for any number of equally speculative reasons, [R. 3-13 at 24]. Taylor cites the

8

witness statements of several individuals, all open union supporters or representatives, in support of his contention that employees began to fear for their jobs if they supported the union effort. [*See* R. 3-3 at 13–14]. Taylor describes Hearthside's reaction to the union effort as having a chilling effect on union support leading up to the vote. [*Id.* at 14].

**4**

Matt Moore, the new third shift supervisor, held a meeting on April 16, 2024, at which he told mixing department employees that the break policy would be strictly enforced. [R. 3-9 at 249; R. 3-10 at 54–55]. Several employees received formal warnings or discipline for break violations in April, including leading union supporter Liticia Horton. [R. 3-6 at 19]. The ALJ found that "the essence of the employee testimony is that they had never been written up for such violations prior to the union organizing campaign." [*Id.* at 20]. Management also conducted a "break audit" in April 2024, which had never before occurred. [*Id.* at 20–21].

As promised by Horn at the December 2023 town hall, Hearthside began cracking down on cell phone use as well. Hearthside fired open union supporters Susan Howard and Edward McCracken on April 18 and April 25, respectively, for cell phone use. [*Id.* at 22; R. 13 at 12–13]. Both admitted at the hearing that they were aware of the zero-tolerance cell phone policy. [R. 3-9 at 44; R. 3-10 at 159]. The ALJ, however, found that there was no evidence that Hearthside "automatically terminated [employees] if caught with their cellphone out . . . prior to March 6, 2024." [R. 3-6 at 25]. The ALJ concluded that "consistent and uniform enforcement of the cellphone (as well as the break rules)" policy "only manifested itself after [Hearthside] was aware of the union organizing campaign[.]" [*Id.* at 28].

The ALJ described other violative acts leading up to the union vote in May. Prior to the March 12 union drive launch, Hearthside required employees to work mandatory overtime. [*Id.*

at 13]. Shortly after the union effort went public, Hearthside made overtime voluntary. [*Id.*] Horn produced a video—displayed in the breakroom up to and during the election—that solicited employee grievances "with the implied promise to remedy them" if they voted against the union.[4] [*Id.*] A Hearthside supervisor promised an employee that a "no" vote would result in the reinstatement of the 401(k) match if employees voted against the union. [*Id.* at 15–16]. At pre-election town halls and cookouts, Hearthside gave away iPads, a television, coolers, and other merchandise, which it had never done before at the London facility or at any of Hearthside's other plants. [*Id.* at 16]. The ALJ also found that Hearthside improperly passed over Bobby Messer, a lead supporter of the union, for a promotion in April in favor of another individual despite Messer's qualifications.[5] [*Id.* at 31].

**5**

The union representation election took place on May 7 and May 8. The union vote failed to pass. Despite obtaining 346 authorization cards, the final tally totaled 222 votes in favor of unionizing and 304 votes against unionizing. [R. 3-3 at 14].

According to the Regional Director, Hearthside's retaliatory activities did not end when it successfully fought off the union vote. On September 18, 2024, roughly four months after the union election, Hearthside fired third shift employee Ben Nolan. [*Id.* at 15]. Nolan was an open union supporter, served as an election observer on behalf of the union, and spoke in support of the union at a conference. [R. 3-13 at 130; R. 3-12 at 107, 112–13]. Hearthside fired Nolan for using his cell phone and for vaping on the production floor. [R. 3-6 at 29]. The company's tobacco policy, like the cell phone policy, is supposedly zero-tolerance. [R. 13 at 17]. The ALJ,

---

[4] The ALJ found that this video "in and of itself warrants the direction of a second election." [R. 3-6 at 14]. Notably, Hearthside did not address this finding in its Response brief.

[5] The ALJ noted that the person who earned the promotion later left for a different role, and Hearthside promoted Messer. [R. 3-6 at 31].

however, found that the company had not terminated employees for violating the anti-tobacco policy, even when combined with other disciplinary issues. [R. 3-6 at 29]. Because an employer violates the Act when it "begins to enforce rule it never enforced previously or starts enforcing them more strictly after learning of a union organizing campaign," the ALJ found that the firing of Nolan was an unfair labor practice even though it occurred several months after the conclusion of the election. [*Id.* at 30].

## C

Lisa Gregory filed several amended charges against Hearthside, beginning the process of Board review. [*See* R. 1-4]. After investigating Gregory's charges, Regional Director Taylor issued a consolidated administrative complaint on February 28, 2025. [R. 1-5]. The parties appeared before the ALJ for a hearing on June 2, 2025. On September 17, 2025, the ALJ issued his Decision. [R. 3-6].

The ALJ made twelve conclusions of law. The ALJ found that Hearthside violated Section 8(a)(1) and/or Section 8(a)(3) of the Act by:

> Engaging in surveillance and otherwise interfering with employees' union activity.
>
> Interrogating employees about their union activities and sympathies.
>
> Soliciting Grievances and impliedly promising to remedy them if employees refrain from selecting a union, including Local 57 of the Bakery Confectionary Tobacco Workers and Grain Millers (BCTGM).
>
> Soliciting grievances and impliedly promising to remedy them if employees refrain from selecting a union, during the representation election by playing the David Horn video.
>
> Calling the police in response to legal union activity at its London, Kentucky facility on March 12, 2024.

11

> More strictly enforcing its cellphone policy, break policy and/or other rules and policies after learning of union activity by terminating and disciplining employees.
>
> Impliedly stating that Respondent would reinstate its 401K match only if employees rejected union representation.
>
> Conducting a raffle and distributing prizes to discourage employees from choosing union representation.
>
> Failing to adequately repudiate its illegal rule prohibiting employees from discussing discipline.
>
> Promulgating and maintaining a handbook rule prohibiting "Malicious gossip or spreading rumors or engaging in behavior designed to create discord and lack of harmony."
>
> Respondent violated Section 8(a)(3) and (1) in terminating Michael Fox, Edward McCracken, Susan Howard and Caleb "Ben" Nolan.
>
> Respondent violated Section 8(a)(3) and (1) in failing to promote Bobby Messer to an area operator position in April 2024.

[R. 3-6 at 32–33]. Both parties filed exceptions to the ALJ decision on November 13, 2025, thereby submitting the decision to the full Board for review. 29 C.F.R. § 101.12.

On March 9, 2026, Taylor petitioned this Court for a temporary injunction pursuant to Section 10(j). [R. 1]. Taylor moved to adjudicate based upon the administrative record and affidavit evidence, obviating the need for a hearing before entering any injunctive relief. [R. 2]; *see also Muffley ex rel. NLRB v. Voith Indus. Servs., Inc.*, 551 F. App'x 825, 826–27 (6th Cir. 2014) (affirming district court's denial of Section 10(j) petition, where district court did not hold show-cause hearing before denying petition). Hearthside did not oppose the motion to adjudicate based on the record, and the Court granted the motion on April 22, 2026.[6] [R. 21]. Taylor submitted his Memorandum in Support of Petition on March 10, 2026, [R. 3], Hearthside

---

[6] Hearthside moved to strike the post-hearing affidavits submitted by Lisa Gregory but agreed with Taylor that the Court should adjudicate the petition based on the administrative record. The Court denied Hearthside's motion to strike. [R. 21].

12

submitted their Response in Opposition on March 31, [R. 13], and Taylor submitted a Reply

brief on April 13, [R. 17]. The matter is fully briefed and ready for adjudication.

## II

Section 10(j) permits a district court to "grant the Board such temporary relief or

restraining order as it deems just and proper." 29 U.S.C. § 160(j). In assessing whether the Board

is entitled to a preliminary injunction under § 10(j), district courts apply the four-part test for

preliminary injunctions articulated in *Winter v. Nat. Res. Def. Council*, 555 U.S. 7 (2008).

*Starbucks*, 602 U.S. at 345. The Regional Director must establish that (1) he is likely to succeed

on the merits, (2) that he is likely to suffer irreparable harm in the absence of preliminary relief,

(3) that the balance of equities tips in his favor, and (4) that an injunction is in the public interest.

*Winter*, 555 U.S. at 20. The Supreme Court in *Starbucks* replaced the Sixth Circuit's previous

test for issuing § 10(j) injunctions, which asked "whether 'there is reasonable cause to believe

that unfair labor practices have occurred,' and whether injunctive relief is 'just and proper.'"

*Starbucks*, 602 U.S. at 344 (quoting *McKinney v. Ozburn-Hessey Logistics, LLC*, 857 F.3d 333,

339 (2017)).

The Court located a single case in the Sixth Circuit where a district court evaluated a

section 10(j) petition under the four-part test after the Supreme Court's decision in *Starbucks*. In

*Kerwin v. Trinity Health Grand Haven Hosp.*, No. 1:24-cv-445, 2024 U.S. Dist. LEXIS 194230

(W.D. Mich. Oct. 25, 2024), Judge Robert J. Jonker in the Western District of Michigan applied

the *Starbucks* factors and found that the Respondent hospital engaged in unfair labor practices in

the wake of a failed effort to decertify a union representing its employees. *Id.* at *32. The

hospital appealed the district court's order to the Sixth Circuit and moved to stay the injunction

13

pending its appeal, which the Sixth Circuit denied. *Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-1975, 2025 U.S. App. LEXIS 24733, at *1 (6th Cir. Sep. 23, 2025).

On May 1, 2026, the Sixth Circuit handed down its *Trinity Health* decision. The Court reversed the district court's order granting the injunction, finding that although the "Director is likely to succeed on the merits, she has failed to demonstrate that irreparable harm will result without an injunction." *Elizabeth K. Kerwin v. Trinity Health Grand Haven Hosp.*, No. 24-1975, 2026 U.S. App. LEXIS 12695, at *2 (6th Cir. May 1, 2026). The Sixth Circuit noted that this case presented the "first occasion to reconstruct our § 10(j) case law post-*Starbucks*." *Id.* at *8. This decision guides this Court's analysis as the Sixth Circuit's authoritative statement on § 10(j) injunctions in the wake of *Starbucks*, particularly since the Sixth Circuit had not used the four-factor test until now. *See id.* at 23 (noting that *Starbucks* required the lower court to support its opinion on out-of-circuit case law, primarily from the Ninth Circuit). With this in mind, the Court turns to the four factors.

A

The first factor requires the plaintiff to make a clear showing that he is likely to succeed on the merits. *Starbucks*, 602 U.S. at 346. The Sixth Circuit's analysis in *Trinity Health* largely addressed the first two factors, likelihood of success on the merits and irreparable harm. The Court defined "likelihood of success" for § 10(j) purposes "to refer not only to the Director's chances of victory before the Board, but also the odds that this Court would grant a petition to enforce the Board's order," noting that a Board's order only has effect when a court of appeals enters a decree enforcing it. *Id.* at *10. The Court then turned to the "merits issues upon which the Director must prevail," analyzing the statutes that the respondent hospital allegedly violated.

14

Taylor charges Hearthside with violating Sections 8(a)(1) and (a)(3). Section 8(a)(1) makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise of the rights" found in Section 7, which protects the right of employees to unionize. 29 U.S.C. § 158(a)(1). Section 8(a)(3) makes it an unfair labor practice for an employer to "discriminat[e] in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization." 29 U.S.C. § 158(a)(3). In plain English, "employers may not discharge, lay off, or discipline employees, or refuse to hire job applicants, because they are pro-Union." *Discriminating against employees because of their union activities or sympathies (Section 8(a)(3))*, NLRB.gov (last visited May 4, 2026), [https://perma.cc/597E-8VTA].

Taylor must present evidence that Hearthside took adverse action against its employees because they participated in activities protected by the Act. *NLRB v. Transp. Management Corp.*, 462 U.S. 393, 401 (1983). The Sixth Circuit recognizes that the timing of an employee's discharge and the disparate disciplinary treatment of pro-union employees compared to other employees violates Sections 8(a)(1) and (a)(3). *Challenge Mfg. Co., LLC v. NLRB*, 815 F. App'x 33, 40 (6th Cir. 2020). The Board uses a "causation test for determining whether a discharge or other disciplinary measure taken against an employee violates the Act." *NLRB v. Inter-Disciplinary Advantage, Inc.*, 312 F. App'x 737, 750 (6th Cir. 2008). The Board must make a *prima facie* case that the employer acted against an employee due to that employee's involvement in a union or other protected activity. *Id.* "A *prima facie* case may be demonstrated by showing that the employee engaged in protected union activity; the employer was aware of such activity; the employer harbored anti-union animus, and such animus was a motivating factor in the adverse decision." *Id.* After establishing a *prima facie* case, "the burden shifts to the

15

employer to demonstrate by a preponderance of the evidence that it would have taken the same action against the employee in the absence of any union or other protected conduct." *Id.* The employer does not satisfy its burden if the employer's explanation is found to be pretextual. *Id*

Taylor is likely to succeed on the merits. Taylor produced sufficient evidence that Hearthside undertook unfair labor actions in response to the unionization effort at their London facility. The ALJ's twelve conclusions of law illustrate a wide-reaching response to the union effort, rather than a handful of acts. [*See* R. 32–33]. And while the ALJ's decision does not bind the court in any way, it does serve "as a useful benchmark for gauging the Regional Director's likelihood of success on the merits." *Frankl ex rel. NLRB v. HTH Corp.*, 693 F.3d 1051, 1063 (9th Cir. 2012); *see also Bloedorn v. Francisco Foods, Inc.*, 276 F.3d 270, 288 (7th Cir. 2001) (finding that "the ALJ is the Board's first-level decisionmaker" and that "the ALJ's factual and legal determinations supply a useful benchmark against which the Director's prospects of success may be weighed."); *but see Overstreet ex rel. NLRB v. United Bhd. Of Carpenters & Joiners of Am., Local 1506*, 409 F.3d 1199 (9th Cir. 2005) ("That the General Counsel has issued a complaint and an ALJ ruled in favor of the General Counsel by no means foreordains the Board's decision.").

Taylor can make out a *prima facie* case that Hearthside violated the Act. It is undisputed that the discharged employees—Fox, McCracken, Howard, and Nolan—were engaged in activity protected by the Act. Hearthside was aware of this activity as early as March 6, 2024, when Hearthside's operations manager became aware of the union interest meeting. The employer undoubtedly harbored anti-union animus, in the sense that Hearthside openly and aggressively opposed the union election.

16

The real dispute is whether Hearthside's "animus" was an animating factor in their decision-making during the union campaign. Taylor, for instance, convincingly argues that Hearthside only began enforcing their workplace policies to the letter when the union campaign got underway. Indeed, the record is replete with instances of Hearthside giving warnings, but never firings, for first-time or otherwise isolated tobacco and cell phone use. That changed as soon as the unionization effort came underway. Hearthside claims they would have made these decisions even absent the union campaign and point to the hirings of Horn and Daniels in support of this point. But Taylor argued that sufficient record evidence existed demonstrating that Hearthside's actions reflected a hostile reaction to prominent union-supporting employees. The ALJ agreed, holding as a conclusion of law that Hearthside violated the Act by "more strictly enforcing its cellphone policy, break policy and/or other rules and policies after learning of union activity by terminating and disciplining employees." [R. 3-6 at 33].

It bears repeating that Hearthside did not address many of the ALJ's other conclusions of law unrelated to the terminations and disciplinary procedures. In their Response, Hearthside does not explain why it held a raffle and distributed prizes as a way to discourage employees from voting in support of the union. Hearthside did not argue how or why their solicitation of grievances and implied promises to remedy their employees' concerns did not violate Section 8(a)(1) or (a)(3). Put simply, Hearthside offered explanations for the firings of Fox, McCracken, Howard, and Nolan, but they did not address any of the ALJ's other conclusions of law finding that the company violated the Act. This supports a finding that Taylor is ultimately likely to succeed on the merits.

Further, should the Board adopt the ALJ's findings, the Sixth Circuit would review the Board's findings of fact on a deferential "substantial evidence" standard, which would favor the

17

Board in proceedings to enforce the ultimate order. *Trinity Health*, 2026 U.S. App. LEXIS 12695, at *21. Accordingly, the Court finds that Taylor has made a clear showing that he is likely to succeed on the merits, meeting the first element of the four-factor test. *Starbucks*, 602 U.S. at 346.

**B**

The Court next turns to the second part of the four-factor test. A plaintiff must make a clear showing that he is likely to suffer irreparable harm in the absence of preliminary relief. *Id.* The question before the Court is whether Taylor, the Regional Director, has done so. As an initial matter, the Court may consider evidence outside of the administrative record in the consideration of this element. [*See* R. 21 at 5 (noting the Court's power to consider evidence outside of the administrative record for the irreparable harm element)].

The *Trinity Health* Court's discussion of the irreparable harm factor, though, largely mirrors the circumstances present in this case. The Sixth Circuit defined irreparable harm as "harm that the Board, entrusted with its own enforcement powers, would otherwise be powerless to fix." *Trinity Health*, 2026 U.S. App. LEXIS 12695, at *21–22. The Court emphasized that "the Board's remedial authority is far from fragile," and that "it is perhaps no surprise that only in rare situations is interim relief needed to protect the Board's ability to remedy unfair labor practices." *Id.* at *22 (citation modified). The Director "must clearly demonstrate certain and immediate harm; speculative or theoretical explanations will not do," and district courts may not use "permissible inferences for demonstrating irreparable harm." *Id.* at *24, *25–26. Indeed, to permit courts to read "permissive inferences" into the irreparable harm analysis would "artificially lighten the Director's evidentiary burden." *Id.* at 26. The Director must demonstrate irreparable harm by "(1) specifically identify[ing] the injury threatened by the alleged unfair

18

labor practice, (2) establish[ing] that the injury is likely to result absent an injunction, and (3) explain[ing] why the Board's § 10(c) remedial powers could not fix the injury after the fact," doing so through "more than mere speculation." *Id.* at *33–34.

In *Trinity Health*, the Regional Director offered two pieces of evidence in support of her contention that irreparable harm would result without the Court's issuance of an injunction. First, she argued that union meeting attendance data fell during the critical time period. *Id.* at *28. The Court did not find this evidence persuasive. It noted that attendance was regularly low before the critical period and, alternately, that the respondent hospital could reach equally convincing inferences from the same numbers. *Id.* at *29.

Second, the Director suggested that the statements contained in a witness affidavit, submitted by an employee who served as the union president, sufficiently showed support for the union in a state of irreparable decline. *Id.* The Court disagreed, noting that the affidavit's "hazy statements" did "not sufficiently demonstrate irreparably declining union support," and that the affidavit failed to answer "whether union support will not just decline, but in fact decline to the extent that the union will be unable to negotiate effectively by the time the Board issues a final order." *Id.* at *30 (citing *Henderson v. Bluefield Hosp. Co., LLC*, 902 F.3d 432, 440 (4th Cir. 2018)). As a result, the Director's evidence left the panel "guessing" and failed "to reflect a clear showing of irreparable harm." *Id.* The Court ultimately concluded that the Director did not "specifically identify the injury threatened by the alleged unfair labor practice," did not "establish that the injury is likely to result absent an injunction," and did not "explain why the Board's § 10(c) remedial powers could not fix the injury after the fact." *Id.* at *33–34.

The Court also found that the Director's delay in seeking a § 10(j) injunction cut against the Director's irreparable harm argument. The Court, amalgamating the holdings from the Sixth

19

Circuit and other circuits, held that a delay of even a few months in filing for injunctive relief could weigh against a finding of irreparable harm. *Id.* at \*34 (collecting cases). This is because "delay undercuts the sense of urgency that ordinarily accompanies a motion for preliminary relief and suggests that there is, in fact, no irreparable injury." *Id.* (quoting *Cheetah Miner USA, Inc. v. 19200 Glendale, LLC*, No. 23-1410, 2023 U.S. App. LEXIS 27041, at \*8 (6th Cir. Oct. 10, 2023)). The Court measured the length of the delay from the date of the Board's entry of the complaint against the respondent hospital. *Id.* at \*35. In *Trinity Health*, the Director waited four months between the issuance of the complaint and the filing of the injunction. *Id.* at \*34–35.

Director Taylor argues that "any effort by the Union or employees . . . to revive the organizing campaign will be futile or doomed to failure." [R. 17 at 2]. The Director asks the Court to "infer the existence of irreparable harm" from the existence of the discharges, the statements of pro-union individuals, and the affidavits of union employee Lisa Gregory. [*Id.* at 2–3]. Some of the statements offered in support of this element constitute hearsay. The Court, of course, may consider "the entire record, including affidavits and other hearsay evidence" at this stage. *Tactical Edge, LLC v. Garland*, 696 F. Supp. 3d 460, 463 (M.D. Tenn. 2023). But the Court affords these statements less weight, particularly when offered for the purpose of drawing an inference. *J.P. Morgan Sec. LLC v. Logsdon*, No. 3:22-cv-14-BJB, 2022 U.S. Dist. LEXIS 8474, at \*3 (W.D. Ky. Jan. 18, 2022).

In light of the Sixth Circuit's decision in *Trinity Health*, the Court will not infer the existence of irreparable harm from the evidence provided by Taylor. 2026 U.S. App. LEXIS 12695, at \*26. Hearthside argues, convincingly, that Taylor relies almost totally on the statements of Lisa Gregory, a union employee, and Leticia Horton, one of the lead union

supporters at the plant. [*See* R. 17 at 3–4]. Both statements rely almost entirely on hearsay.[7] Gregory's affidavit, in particular, vaguely references discussions with "new employees" who are "afraid to get involved with the Union[.]" [R. 3-28 at 2]. "Hazy statements like these do not sufficiently demonstrate irreparably declining union support" and ultimately Taylor's proffered evidence "fails to answer . . . whether union support will not just decline, but in fact decline to the extent that the union will be unable to" petition for a new election "by the time the board issues a final order." *Trinity Health*, 2026 U.S. App. LEXIS 12695, at *30. Taylor does not describe how the injury is either "certain" or "immediate," and instead asks the Court to infer harm from certain facts. This the Court will not do.

In addition to the Director's evidentiary deficiencies, his "delay in seeking an injunction seals the deal." *Id.* at *34. The parties dispute the date by which to measure the Director's filing delay. Taylor argues, not unreasonably, that the Court should consider only the time from the ALJ's decision, September 17, 2025, until the filing of the petition on March 9, 2026, representing a period of 173 days, nearly five months. [R. 17 at 4–5]. Hearthside notes that the statute authorized Taylor to file the injunction as early as February 28, 2025, the date that the Board issued the consolidated complaint, which constitutes 374 days, just over a full year. [R. 13 at 22]. In *Trinity Health*, the Sixth Circuit measured the delay from the date of the Board complaint to the date of the petition, noting that a director cannot file a § 10(j) petition with a district court until issuing a complaint with the Board. 2026 U.S. App. LEXIS 12695, at *35.

---

[7] Nearly all of Horton's conclusory paragraphs in her witness statement begin with the statement, "I have heard." [*See* R. 3-24 at 10–11]. Horton's witness statements contain numerous alterations written in pen, suggesting that someone else may have written this statement. For example, on page 7, someone—presumably Horton—crossed out a sentence and scribbled "can't remember who was in breakroom at this time," directly contradicting the crossed-out portion which named specific individuals. Other similar alterations are present throughout the document.

21

The Court is not unsympathetic to the Director's argument in favor of waiting to file the petition until after the ALJ reached a decision. Taylor notes that without the ALJ decision the administrative record would be incomplete, hindering the district court's review of any § 10(j) petition. [R. 17 at 4–5]. Perhaps so. But even if the Director is correct on that point, why did he wait five months to file the petition? If Hearthside's ongoing acts were so outrageous and causing such irreparable harm, why not file for a § 10(j) petition within days or weeks after the ALJ's decision?

The Director makes no attempt to explain the reason for the delay even when calculating the delay on his own terms. Whether by one year or five months, the delay in this case "undercuts the sense of urgency implied by the Director's evidence and suggests that there is, in fact, no irreparable injury." *Trinity Health*, 2026 U.S. App. LEXIS 12695, at \*35. A preliminary injunction's fundamental purpose is to preserve the status quo during the pendency of the action. *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981). An injunction would not preserve the status quo in this case. Absent an injunction, the parties will continue to wait on the result of the Board's review of the ALJ order. Because the Director has not shown that any irreparable harm will occur in the meantime, the Court is satisfied knowing that the relative position of all interested parties remains the same.

Because the Court finds that the Director cannot show that irreparable harm would exist absent an injunction, the Court need not spill ink addressing the remaining two factors. *Trinity Health*, 2026 U.S. App. LEXIS 12695, at \*8 (a "failure to make a clear showing as to any of the four factors sinks the Board's request[.]"). This is particular true where the Court finds that the Director has not shown the existence of irreparable harm, the factor which "is the core of the

22

preliminary injunction, without which the Board's request for relief falls flat." *Id.* (citation modified).

**III**

Accordingly, and the Court being sufficiently advised, it is hereby **ORDERED** as follows:

1. Petitioner Eric Taylor's Petition for Temporary Injunction **[R. 1]** is **DENIED**.

2. All matters having been resolved, this action is **DISMISSED** and **STRICKEN** from the Court's active docket.

3. A final judgment will be entered contemporaneously with this Order.

This 18th day of May, 2026.

Gregory F. Van Tatenhove
United States District Judge